SHANNA EZELL,                                                      PLAINTIFF

v.

RENAL CARE GROUP, INC.,                                           DEFENDANT

## MEMORANDUM OPINION & ORDER

This matter is before the Court on Defendant Renal Care Group, Inc.'s ("Renal Care")[1] Motion for Summary Judgment. [R. 20.] Plaintiff Shanna Ezell responded, [R. 24], and Renal Care replied, [R. 28]. Fully briefed, this matter is now ripe for adjudication. For the reasons stated herein, Renal Care's Motion for Summary Judgment, [R. 20], is **GRANTED IN PART AND DENIED IN PART**.

## BACKGROUND

On May 23, 2013, Ezell started working for Renal Care as a clinical certified hemodialysis technician at the Paducah dialysis clinic. [R. 24-1 at 8-9 (Ezell Depo.).] Ezell worked under the supervision of Brooklyn Nicks, the Clinical Manager. [*Id.* at 16.] According to a Renal Care corrective action form, Ezell was terminated from her position on October 24, 2014 after prior warnings "regarding attendance." [R. 24-11 at 1 (Termination Form).]

Renal Care's attendance/tardiness policy states: "Regular attendance and punctuality are essential for providing efficient and quality patient care." [R. 24-3 at 1 (Attendance Policy).] Ezell received a copy of this policy on May 28, 2013. [R. 24-1 at 16.] The policy applies to all employees, and all employees "are subject to the corrective action process for excessive

---

[1] The defendant has also been referred to as Fresenius Medical Care Paducah. [*See* R. 1-1 at 2-3.]

occurrences of absenteeism and/or tardiness." [R. 24-3 at 1.] An "unscheduled/unexcused absence" is defined as "[a] request that is not submitted within 48 hours . . . ." [*Id.*] Furthermore, "[a] physician's note may be required for unscheduled absences at the discretion of the Location Manager. This note does not necessarily excuse the absence. A pattern of excessive absences, with or without a physician's note, may result in corrective action." [*Id.*] The policy defines tardiness as occurring whenever employees "are not at their work station at the scheduled start time of their shift." [*Id.*] It requires that "[e]mployees who are absent or tardy . . . notify their supervisor . . . prior to the start of their scheduled shift" with as much notice as possible. [*Id.*] "An employee who fails to report for work and fails to notify his/her supervisor on a scheduled day will be subject to the corrective action process." [*Id.*]

The policy implements a set of guidelines to determine when corrective action is necessary: "The time frame used to record unscheduled absences and tardiness will be for a 12 month period. This time period will be measured from the current date back to the previous 12 months. . . . Occurrences of absenteeism and tardiness will be added together to determine the need for corrective action . . . ." [*Id*. at 2.] Under the policy, six to seven absences/tardiness qualifies the employee for the standard of "Needs Improvement," and greater than seven absences/tardiness qualifies the employee for the standard of "Unsatisfactory." "An employee who has reached the "Needs Improvement" level of absenteeism or tardiness will be subject to the corrective action process. . . . Depending on the nature and severity of the infraction, steps in the corrective action process may occur." [*Id.*]

On March 20, 2014, Ezell received "Documented Counseling," which is defined on the "Corrective Action Form" as "a documented discussion to address the required need for improvement prior to initiating further corrective action." [R. 24-4 at 1 (Doc. Counseling Form).]

According to the corrective action form, this was due to "[n]umerous tardies ranging up to 2 hours late as well as several unscheduled absences, (7/15, 7/16, 9/12, 9/13, 11/11, 12/13)." [*Id*.] In her deposition, Ezell testified that she was absent July 15-16, 2013 due to being sick with the flu and September 12-13, 2013 due to strep throat and a sinus infection. [R. 24-1 at 24-25]. Ezell testified that she was sick on December 12, and she received a doctor's note excusing her from work for the next four days. [*Id*.] She testified further that she called Nicks that day to inform her that she could not work the following four days. [*Id*.] Ezell provided a doctor excuse note for her absences on September 12 and 13, [R. 24-19 at 2 (Medical Excuse)], as well as the doctor note that excused her from work for four days in December, [*Id*. at 3].

On May 20, 2014, Ezell received a "Written Warning," which is "a documented warning to address expectations and need for immediate improvement." [R. 24-5 at 1 (Written Warning).] The corrective action form's "description of situation" reads: "5/1/14 staff 20 minutes late, 5/13/14 staff member called in, 5/16/14 staff only worked 0546-0710, went home sick but did not notify Clinic Manager until 5/19/14." [*Id*.] Ezell disputed part of this account in her deposition, testifying that she attempted to contact Nicks on May 16, but she could not reach her, so she left a voicemail. [R. 24-1 at 28-29.] Ezell did not provide a doctor excuse note or medical documentation for any of these instances.

On July 14, 2014, Ezell received a "Final Written Warning," which is "a documented warning to address expectation and need for immediate improvement following previous warning(s) or immediately for more severe misconduct or performance." [R. 24-6 at 1 (Final Written Warning).] The corrective action form's "description of situation" reads: "7/9/14 staff member called out for shift at 0548. Shift was scheduled to begin at 0540. Shanna stated that she did not have managers [sic] phone number, number is listed on staffing schedule. Shanna did not

call the clinic until 0545 to obtain manager's number." In her deposition, Ezell testified that she cannot remember why she was absent on July 9, but she "called and called all morning long" and no one at the clinic would answer the phone. [R. 24-1 at 32-33.] Ezell did not provide a doctor excuse for this absence.

On September 1, 2014, while at work, Ezell started to experience abdominal pain. [*Id.* at 47-48.] According to Ezell's deposition, her charge nurse walked her to the emergency room at Lourdes Hospital to be seen by a doctor. [*Id.*] She was admitted to the hospital for "further evaluation, additional testing, monitoring, IV therapy and antibiotics and pain control." [R. 21-11 at 5 (Lourdes Documentation).] On September 2, 2014, after staying the night at the hospital, Ezell decided that she needed to take FMLA leave because she "had been getting sick and getting sick up to the point of being hospitalized and [she] needed to take a rest and see some doctors." [R. 24-1 at 51.] According to Ezell's deposition, she called Nicks that day, and informed her that she was hospitalized and explained her diagnosis. [*Id.* at 45.] Furthermore, Ezell testified:

> And I told her that I felt that I needed to take FMLA because I had been – I kept getting sick up to the point of now being hospitalized. And that my blood work was abnormal. And that I had an unknown virus and I needed to take FMLA so I could get my health together. I told her I had pre-appendicitis. I was under observation for surgery.

[*Id.* at 45:3-9.] Ezell testified that Nicks told her that she did not qualify for FMLA unless she had surgery. [Id. at 57:1-4, 57:15-19.] Nicks denied this in her deposition. [R. 21-12 at 22:25-23:2 (Nicks Depo.).] Furthermore, Nicks testified that they did discuss FMLA; however, she told Ezell what she tells all employees: "I don't know what you qualify for because that is not a decision made by me, you need to call the human resources leave office to talk with them to obtain the paperwork from them for the physician, and then they'll notify me if you're approved." [*Id.* at 22:1-7.]

Ezell was discharged from the hospital on September 2, 2014, with no medication to be taken at home and no restrictions on activities. [R. 24-7 at 14.] The doctor noted that he suspected the abdominal pain was related to constipation as he saw "no other inflammatory changes to suggest appendicitis." [*Id*. at 25.] Furthermore, he stated that this was further supported by "a normal white count,[2] lack of fever and normal vital signs." [*Id*.] According to Nicks's deposition, Ezell was not disciplined under the attendance policy for these particular absences. [R. 21-12 at 19:18-20:17.]

On September 8, 2014, Ezell was seen at the emergency room at Massac Memorial Hospital for abdominal pain. [R. 24-8 at 1 (Massac Report).] Ezell was seen by a physician at 16:43, [*Id*. at 1], and departed at 18:24, [*Id*. at 5]. Under "Departure," the report from Massac stated that Ezell's condition was "good" and instructed Ezell to increase intake of fluids, take "Levsin 0.125" for pain, and "recheck PMD one week." [*Id*.] Ezell testified in her deposition that on September 29, 2014, she was having heart palpitations and a fever while working at different Renal Care clinic in Metropolis, and her physician instructed her over the phone to leave work and go to the emergency room. [R. 24-1 at 35.] She further testified that she told the clinical manager in Metropolis, Julie Roberts, that her physician instructed her to go to the emergency room, but she could not recall if she spoke to Nicks about the incident. [*Id*. at 35-36.] On the sign-in sheet for the Baptist health emergency room, Ezell listed many symptoms, including "severe abdominal pain." [R. 24-9 at 1 (Baptist Sign-In Sheet).] The doctor's clinical impression from the visit also listed abdominal pain, and instructed Ezell to follow up with her doctor because she needed testing that could not be done in the emergency room. [R. 24-9 at 6-7

---

[2] Ezell seems to dispute this. She testified in her deposition: "my neutrophils, my lymphocytes, my red blood cells, my white blood cells. They were all abnormal." [R. 24-1 at 46:2-4.]

(Baptist Doctor Notes).] She left the emergency room at Baptist Health without being admitted into the hospital. [*Id*. at 28.]

Ezell testified in her deposition that on October 11, 2014 she worked two hours of her shift, and her charge nurse sent her home due to a fever, a bloody, irritated esophagus, and an infection. [R. 24-1 at 40:2-6.] She testified further that both her and the charge nurse attempted to contact Nicks but received no response. [*Id*. at 40:9-12.]

On October 13, 2014, Ezell was put on "Disciplinary Suspension" due to her absence on September 29, 2014. [R. 24-10 at 1 (Discip. Suspension).] "Disciplinary Suspension" involves "unpaid time away from work implemented after consultation with HR." [*Id*.] According to the corrective action form, Ezell received this corrective action because she told the staff that her doctor instructed her to go to the emergency room, but she failed to inform the clinical manager of the Metropolis clinic or the clinical manager of her home clinic. [*Id*.] In her deposition, Ezell testified that when Nicks told her she was being suspended, she did not understand the reasoning for the action because she had provided medical documentation for her absences. [R. 24-1 at 36:23-37:2.] Furthermore, she testified that she told Nicks that she felt she was being discriminated due to her health issues, and Nicks was retaliating against her because she complained about this discrimination. [*Id*. at 37:4-7.]

On October 24, 2014, Ezell was terminated. [R. 24-11 at 1.] Termination is defined on the corrective action form as "employment ended due to insufficient improvement related to performance or behavior or as a result of misconduct requiring immediate termination." [*Id*.] The description of the situation on the form states: "On 10/11/2014 staff member only worked 2 hours of her shift, told staff that she was sick and needed to leave. She attempted to contact CM one time, but did not wait for a return call leaving the clinic before speaking to the CM." [*Id*.]

On October 21, 2016, Ezell filed a complaint in Morgan Circuit Court in Kentucky, alleging counts of disability discrimination, FMLA interference, FMLA retaliation, and KCRA retaliation. [R. 1-1 at 8-10.] On November 15, 2016, Renal Care removed the case to federal court. [R. 1.] On November 28, 2016, Renal Care filed the Motion for Summary Judgment that is currently before the Court. [R. 20.]

## STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

The moving party must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of the nonmovant's claim or defense. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex*, 477 U.S. at 324). Assuming the moving party satisfies its burden of production, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue

for trial." *Laster*, 746 F.3d at 726 (citing *Celotex*, 477 U.S. at 324). "[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). Nor will mere speculation suffice to defeat a motion for summary judgment: "[t]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

## DISCUSSION

Ezell brings four different causes of action: interference under the FMLA, retaliation under the FMLA, retaliation under the KCRA, and disability discrimination under the KCRA. [R. 1-1 at 7-9.] Renal Care moves for the Court to grant summary judgment on all four claims. [*See* R. 20-1.] The Court will address each cause of action in turn.

### I.      The Family Medical Leave Act (FMLA)

"The FMLA entitles qualifying employees up to 12 work weeks of leave under specified circumstances, including if they are suffering from a serious health condition." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 307 (6th Cir. 2016) (citing 29 U.S.C. § 2612(a)(1)(D)). The Sixth Circuit "has recognized two theories of recovery under the FMLA: interference and retaliation." *Id.* (citing *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012)). In this case, Ezell brings claims under both theories.

### A.  FMLA Interference

The FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). "[A]n employer violates the FMLA under the 'interference' theory if it fails to provide its employee with his FMLA entitlements or interferes with an FMLA-created right, regardless of the employer's intent." *Casagrande v. OhioHealth Corp.*, 666 F. App'x 491, 496 (6th Cir. 2016) (citing *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)).

Employees may prove claims of FMLA interference using the *McDonnell Douglas* burden-shifting framework. *Demyanovich v. Cadon Plating & Coatings, LLC*, 747 F.3d 419, 427 (6th Cir. 2014) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973)). Under that framework, "the employee has the initial burden of establishing his prima facie case; if he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; finally, the employee has the burden of rebutting the employer's proffered reasons by showing them to be pretextual." *Id.* (citing *Donald v. Sybra, Inc.,* 667 F.3d 757, 761–62 (6th Cir. 2012)).

### 1. Statute of Limitations

As an initial matter, the Court must address Renal Care's argument that Ezell's FMLA interference claim is time barred. According to the FMLA, "an action may be brought under this section not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought." 29 U.S.C. § 2617(c)(1). Here, Ezell alleges that her request for FMLA leave was denied by Nicks on September 2, 2014, [R. 1-1 at 4-5], and that she was fired on October 24, 2014, [*Id*. at 6]. Ezell filed the Complaint on October 21, 2016. [*See id.*.]

Renal Care argues that this case is time barred because Ezell did not file the Complaint until over two years after she was denied FMLA leave. [R. 20-1 at 7.] Ezell responds, as she

alleged in her Complaint, that Renal Care *willfully* violated the FMLA when it denied Ezell's request for FMLA leave on September 2, 2014. [R. 24 at 25.] A willful violation of the FMLA extends the statute of limitations to three years from the violation. 29 U.S.C. § 2617(c)(2). "[T]he standard for willfulness under the FMLA extended statute of limitations is whether the employer intentionally or recklessly violated the FMLA." *Hoffman v. Prof'l Med Team*, 394 F.3d 414, 417 (6th Cir. 2005).

Ultimately, the Court cannot decide this issue at this time, as there is a genuine dispute of material fact over whether Nicks actually denied Ezell's request for FMLA on September 2, 2014. Therefore, it would be inappropriate for the Court to now decide whether this alleged violation was willful. Both parties provided contradictory testimony recalling the phone conversations between Ezell and Nicks while Ezell was in the hospital. In Nicks's deposition, Nicks specifically denied that she told Ezell that "she would not qualify for FMLA unless she had surgery." [R. 21-12 at 22:25-23:2.] Furthermore, Nicks stated that when Ezell mentioned FMLA, she told Ezell: "I don't know what you qualify for because that is not a decision made by me, you need to call the human resources leave office to talk with them to obtain the paperwork from them for the physician, and then they'll notify me if you're approved." [*Id*. at 22:1-7.] In contrast, Ezell stated in her deposition that Nicks told Ezell that she spoke with "HR," and Ezell did not qualify for FMLA unless she had surgery. [R. 21-1 at 58:21-25.] As the Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial," *Laster*, 746 F.3d at 726, it is inappropriate for the Court to decide this issue at this time.

### 2. Prima Facie Case of FMLA Interference

In order for Ezell to make out a prima facie case of FMLA interference, she "must show that: (1) [she] was an eligible employee; (2) [Renal Care] was a covered employer under the FMLA; (3) [she] was entitled to take leave under the FMLA; (4) [she] notified [Renal Care] of [her] intent to take leave; and (5) [Renal Care] denied [her] benefits or rights to which [she] was entitled under the FMLA." *Demyanovich*, 747 F.3d at 427 (citing *Edgar v. JAC Prods., Inc.,* 443 F.3d 501, 507 (6th Cir. 2006)). As Renal Care only disputes the third and fifth elements, the Court will address both of those elements in turn. [R. 20-1 at 9.]

Under the third element, Renal Care argues that Ezell was not entitled to FMLA leave following her overnight stay in the hospital "because she cannot establish that she had an FMLA-qualifying serious health condition that made her unable to perform the functions of her position at that time." [*Id.*] The FMLA defines "serious health condition" as "an illness, injury, impairment, or physical or mental condition that involves--(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11). "Whether an illness qualifies as a serious health condition is a legal issue for the Court to decide." *Perk v. Nyrstar Clarksville, Inc.*, No. 3:12–0913, 2014 WL 1379170, at *3 (M.D. Tenn. Apr. 8, 2014) (citing *Taylor v. Autozoners, LLC*, 706 F. Supp. 2d 843, 849 (W.D. Tenn. 2010)). Renal Care asserts that it was Ezell's "subjective decision" that she needed more time off from work, rather than anything from her medical records indicating that she was incapable of performing her job. [R. 20-1 at 9-10.] Ezell responds that her overnight hospital stay from September 1 to September 2 demonstrates that she was entitled to FMLA leave under either portion of the "serious health condition" definition. [R. 24 at 26-27.]

There is no genuine dispute as to the fact that Ezell was admitted to the hospital and stayed overnight as a result of abdominal pain. [R. 21-11 at 1.] The Code of Federal Regulations

defines "inpatient care" as "an overnight stay in a hospital, hospice, or residential medical care facility, including any period of incapacity as defined in § 825.113(b), or any subsequent treatment in connection with such inpatient care." 29 C.F.R. § 825.114. The Sixth Circuit has acknowledged that an overnight stay at a hospital may qualify an employee for FMLA leave. *See Hicks v. Leroy's Jewelers, Inc.*, 225 F.3d 659, at *3 (6th Cir. 2000) (unpublished) (holding that the plaintiff's overnight stay at the hospital "raised the question" of a serious health condition, but an affidavit in which the plaintiff stated that was she able to return from work afterward created a genuine issue of material fact); *Reich v. Midwest Plastic Eng'g, Inc.*, No. 1:94-CV-525, 1995 WL 478884, at *8 (W.D. Mich. June 6, 1995) ("[T]here is no genuine issue as to the fact that Ms. Van Dosen was admitted into the hospital and retained overnight as a direct result of her having chicken pox. This fact alone sufficiently establishes that Ms. Van Dosen's condition constituted a 'serious health condition.'") (later dismissed on different grounds). Therefore, the Court finds that Ezell's abdominal pain, which caused her to stay overnight at the hospital, qualified as a serious health condition under the FMLA.[3]

In regards to the fifth element of an interference claim, Renal Care argues that because Ezell cannot establish that she was entitled to FMLA leave, she cannot establish that she was denied that leave. [R. 20-1 at 10.] As the Court has already found that Ezell did establish that she was entitled to FMLA leave, this argument fails. Furthermore, the Court has already held that there is a genuine dispute of material fact over whether Ezell was denied leave by Nicks.

### 3. Application of *McDonnell Douglas* Framework

As the Court previously explained, employees may prove claims of FMLA interference using the *McDonnell Douglas* burden-shifting framework. *See Demyanovich*, 747 F.3d at 427

---

[3] The Court finds it unnecessary to decide at this time whether Ezell's abdominal pain qualified under the "continuing treatment" portion of the definition of "serious health condition" as it has already held that it qualifies under the "inpatient care" portion.

("An employee may prove FMLA interference using the familiar burden-shifting framework articulated in *McDonnell Douglas* . . .."); *Donald,* 667 F.3d at 762 (holding that the district court correctly applied the *McDonnell Douglas* framework to both the interference and retaliation claims of the plaintiff).

The Court has already found that Ezell established a prima facie case of FMLA interference, so the burden now shifts to Renal Care to articulate "a legitimate, non-discriminatory reason for its actions." *Demyanovich*, 747 F.3d at 427. The employer's burden is merely a "burden of production," and if the employer successfully carries this burden, "the plaintiff will have a full and fair opportunity to demonstrate pretext." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255-56 (1981). Renal Care states that it fired Ezell for the legitimate, non-discriminatory reason of excessive absenteeism. [R. 20-1 at 13.] True, the Sixth Circuit has held that "a poor attendance record" can serve as a legitimate, nondiscriminatory reason for termination. *Harris v. Circuit Court, Clerk's Office, Metro. Nashville*, 21 F. App'x. 431, 433 (6th Cir. 2001). Renal Care developed a record of Ezell's poor attendance by documenting her absenteeism through the issuance of "Corrective Action Forms." As Ezell's history of absenteeism and tardiness progressed, she was issued a "Corrective Action Form" for "Documented Counseling," "Written Warning," "Final Written Warning," "Disciplinary Suspension," and "Termination." All of these forms contained a note stating: "Failure to meet expectations will result in further corrective action, up to and including termination of employment." [R. 24-3 at 1.] At the time of her termination, Ezell had amassed seven unexcused absences and forty-three instances of tardiness over the previous twelve months. [R. 24-17 at 1-2; R. 21-5 at 1-8.] Granted, most of the instances of tardiness only involved a digression of less than five minutes. [R. 21-5 at 1-8.] However, on three occasions Ezell was at least twenty

minutes late and on one occasion she was two hours and twenty-seven minutes late. [*Id.*] As the absences and instances of tardiness accumulated, Renal Care walked through each type of corrective action with Ezell until she reached the level of termination.

In response, Ezell asserts that no legitimate, non-discriminatory reason for her termination exists. [R. 24 at 32.] Specifically, Ezell argues that Renal Care's reason for firing her is "intimately intertwined with the FMLA leave itself, and therefore, cannot be used as a legitimate basis for her termination." [*Id.* at 33.] She explains that her absences on September 29, 2014 and October 11, 2014 were "a direct result of failing to perfect her FMLA leave, which is a consequence of Defendant failing to meet its responsibilities[4] under the FMLA." [*Id.* at 32.] The Sixth Circuit previously came to a similar conclusion in *Arban v. West Publishing Corp.*, 345 F.3d 390 (6th Cir. 2003), and *Wallace v. FedEx Corp.*, 764 F.3d 571, 590 (6th Cir. 2014).

In *Arban*, the Sixth Circuit elicited the following quote from the Tenth Circuit in deciding that the defendant employer denied the plaintiff employee his substantive right to reinstatement at his position after FMLA leave:

> "[A]n employee who requests FMLA leave would have no greater protection against his or her employment being terminated for reasons not related to his or her FMLA request than he or she did before submitting that request." *Gunnell v. Utah Valley State Coll.,* 152 F.3d 1253, 1262 (10th Cir.1998). An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave. *Id.*

*Arban*, 345 F.3d at 401. Subsequently, the Sixth Circuit referred back to this quote in *Wallace v. FedEx Corp.* when it decided that the defendant, FedEx, had a legitimate reason, which was independent of FMLA leave, for terminating the plaintiff employee, Wallace. *See Wallace*, 764

---

[4] By "responsibilities" the Court assumes that Ezell is referring to the requirement that an employer give the employee an Eligibility Notice, Rights and Responsibilities Notice, and Designation Notice upon receiving a request for leave from the employee. *See Ashby v. American, Inc.*, No. 3:15-CV-00643-GNS, 2017 WL 939324, at *7-8 (W.D. Ky. March 9, 2017) (listing three types of notice required from employer upon receiving request for FMLA leave from employee) (Stivers, J.).

F.3d at 590. In that case, upon Wallace's request for leave, FedEx gave Wallace FMLA leave paperwork, including a medical certification form, and told her she had fifteen days to complete and return it. *Id*. at 590. However, FedEx never advised Wallace of the "anticipated consequences of an employee's failure to provide adequate certification," as required under 29 C.F.R. § 825.305(d). *Id*. When Wallace did not return to work for two consecutive days after the initial two weeks of leave, she was terminated. *Id*. at 578-579. Under FedEx's attendance policy, an employee could be terminated after two consecutive days of unexcused absence. *Id*. The Sixth Circuit held that FedEx's reason for terminating Wallace, i.e., failing to comply with the company's attendance policy by being absent for two consecutive days, was not independent from the FMLA leave at issue when Wallace's failure to report to work was "a direct result of failing to perfect her FMLA leave, which is a consequence of FedEx failing to meet its responsibilities under § 825.305." *Id*. In other words, the purported legitimate reason for termination was "intimately intertwined" with her FMLA leave. *Id*.

This Court encountered a situation closer to the facts at hand in *West v. Pella Corporation*, in which the defendant employer, Pella, argued that the plaintiff employee's absenteeism through June to August of 2014 and February of 2015 served as a legitimate, nondiscriminatory reason for termination. *West*, No. 5:16-CV-154-TBR, 2018 WL 345115, at *8 (W.D. Ky. Jan. 9, 2018) (Russell, J.). However, the Court rejected this argument when it found that the absences of the employee during June, July, and August of 2014 may have been protected under the FMLA. *Id*. Thus, Pella's reason for termination was "intimately intertwined" with the employee's potentially qualifying FMLA leave. *Id*. The Court held that genuine disputes remained as to whether the 2014 absences could serve as a legitimate, nondiscriminatory reason for his termination. *Id*.

In this case, Ezell quotes the Sixth Circuit's argument from *Wallace* to argue that her situation follows the same path.[5] [R. 24 at 33.] Essentially, Ezell implies that her absences on September 29, 2014 and October 11, 2014 should be treated the same as the absences of the plaintiff in *Wallace*. [*Id*. at 32.] Unlike the plaintiffs in *Arban* or *Wallace*, the Court does not have before it in the record an official period of documented FMLA leave. However, the Court has already found that Ezell's abdominal pain qualified as a serious health condition, as it required an overnight stay at the hospital. In the Sixth Circuit, courts have found that this entitles the patient to FMLA leave "for the period of time she was receiving inpatient care in the hospital and subsequent treatment in connection with the inpatient care." *Bickford v. Life Care Ctr. of Am.*, No. 1:07-CV-295, 2008 WL 5245993, at *4 (E.D. Tenn. Dec. 15, 2008); *Stepp v. Castrucci of Alexandria, LLC*, No. 10-146-WOB-CJS, 2011 WL 7046018, at *4 (E.D. Ky. Dec. 19, 2011) (holding that the plaintiff's daughter's cancer satisfied "the 'inpatient' prong of the 'serious health condition' definition because throughout her cancer treatment, she periodically had to stay at the hospital"); *Bryant v. Delbar Prod., Inc.*, 18 F. Supp. 2d 799, 802 (M.D. Tenn. 1998) (holding that the plaintiff had a serious health condition on March 27, 1995 when he was hospitalized with advanced kidney failure from March 26, 1995 through March 29, 1995). This would entitle Ezell to FMLA leave for her time in the hospital on September 1 and 2, as well as leave for her emergency room trips on September 8 and 29 that were related to abdominal pain.

---

[5] The specific portion of *Wallace* that Ezell quotes for her argument reads:

> In some cases, this pre-leave finding would be enough to allow an employer to fire an employee despite the FMLA. However, when the absences and cause for discharge relate directly to the FMLA leave and the company's failure to give notice, as they do in this case, there is no legitimate and independent reason for dismissal. In this case, the purported legitimate reason is intimately intertwined with the FMLA leave, and therefore, we reject FedEx's contention.

*Wallace*, 764 F.3d at 590.

In the end, this would mean that Ezell may have been entitled to FMLA leave on September 29, 2014.

Similar to the plaintiff in *West*, Renal Care claims it terminated Ezell, in part, based on an absence that may have been qualified as FMLA leave. *See West*, No. 5:16-CV-154-TBR, 2018 WL 345115, at *8. In fact, Ezell was put on Disciplinary Suspension specifically because of the absence on September 29. [R. 24-10 at 1 (Discip. Suspension).] Therefore, Renal Care's reason for terminating Ezell was "intimately intertwined" with Ezell's potentially FMLA-qualifying leave. *See id.*; *Wallace*, 764 F.3d at 590 ("[W]hen the absences and cause for discharge relate directly to the FMLA leave and the company's failure to give notice . . . there is no legitimate and independent reason for dismissal.") "In this case, the purported legitimate reason is intimately intertwined with the FMLA leave, and therefore, we reject [Renal Care's] contention." *Wallace*, 764 F.3d at 590. Renal Care's Motion for Summary Judgment as it pertains to Ezell's claim of FMLA interference is DENIED.

### B. FMLA Retaliation

The FMLA also makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA. 29 U.S.C. § 2615(a)(2). "An employer also violates the FMLA under the 'retaliation' theory if it takes adverse action against an employee because the employee invokes an FMLA right, rather than for a legitimate, nondiscriminatory reason." *Casagrande*, 666 F. App'x at 496 (citing *Seeger*, 681 F.3d at 282). Unlike with FMLA interference, "[a] plaintiff proceeding under a[n] [FMLA] retaliation theory must show discriminatory or retaliatory intent." *Tennial*, 840 F.3d at 308.

In order for Ezell to make out a prima facie case of FMLA retaliation, she "must show that (1) [she] engaged in an activity protected by the [FMLA], (2) this exercise of [her] protected rights was known to [Renal Care], (3) [Renal Care] thereafter took an employment action adverse to [Ezell], and (4) there was a causal connection between the protected activity and the adverse employment action." *Tennial*, 840 F.3d at 308 (citing *Arban*, 345 F.3d at 404). After establishing a prima facie case of retaliation, the parties must engage in the *McDonnell Douglas* burden shifting framework. *Casagrande*, 666 F. App'x at 499.

### 1. Causal Connection

The only FMLA retaliation factor contested by the parties is the fourth: whether there was a causal connection between the protected activity and the adverse employment action. Renal Care argues that the timing of Ezell's termination in relation to being denied FMLA leave is "nothing but coincidence that cannot support a finding of causation." [R. 20-1 at 12.] In support, Renal Care cites to case law from the Southern District of Ohio, as well as the Sixth Circuit in *Donald v. Sybra, Inc.*. As an initial matter, the Court notes that the Sixth Circuit stated in *Donald* that "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding *pretext*." *Donald*, 667 F.3d at 763 (emphasis added). The court did not state that temporal proximity cannot be the sole basis for establishing a *causal connection*. In response to Renal Care, Ezell cites several Sixth Circuit cases for the opposite notion—that close temporal proximity *can* be the sole basis for establishing a causal connection in a retaliation claim. [R. 24 at 35.] The standard which the Sixth Circuit uses to assess this issue is not as clear and concise as either party would like to believe. The Sixth Circuit has stated:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses

between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). Here, Ezell was fired less than two months after she allegedly requested FMLA leave. [R. 24-11 at 1.] Similarly, the Sixth Circuit found in *Clark v. Walgreen* that a period of less than three months between the plaintiff's FMLA leave and termination was "sufficient evidence of a causal connection between the two." *Clark*, 424 F. App'x 467, 473 (6th Cir. 2011). Thus, the temporal proximity between the events in this case is close enough to establish a causal connection between the protected activity and the adverse employment action.

### 2. Application of *McDonnell Douglas* Framework

The Court has already held that Renal Care failed to provide a legitimate and independent reason for termination. Therefore, it is not necessary for the Court to engage in an analysis of the *McDonnell Douglas* framework at this juncture. Renal Care's Motion for Summary Judgment as it pertains to Ezell's claim of FMLA retaliation is DENIED.

## II. The Kentucky Civil Rights Act (KCRA)

### A. KCRA Retaliation

The KCRA states that it is unlawful for a person to "retaliate or discriminate in any manner against a person because he has opposed a practice declared unlawful by this chapter, or because he has made a charge, filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this chapter . . .." Ky. Rev. Stat. Ann. § 344.280(1). To establish a prima facie case for retaliation, a party must demonstrate: (1) she engaged in a protected activity; (2) her engagement in that protected activity was known to her employer; (3) her employer, thereafter, took an adverse employment action against her; and (4)

that a causal link exists between her engagement in the protected activity and the adverse

employment action. *Brooks v. Lexington–Fayette Urban Cty. Hous. Auth.*, 132 S.W.3d 790, 801–

803 (Ky. 2004); *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (applying the

same standard under Title VII). Renal Care asserts three reasons why Ezell's claim of KCRA

retaliation should fail: (1) Ezell cannot establish that she engaged in protected activity, (2) she

cannot establish a causal connection, and (3) she cannot establish pretext. [R. 20-1 at 22.]

First, Renal Care argues that Ezell cannot establish that she engaged in protected activity

because "she did not allege that she ever complained about a discriminatory practice that is

prohibited by the KCRA . . .." [R. 20-1 at 24.] Ezell responds in opposition by stating that, upon

being suspended on October 13, 2014, she complained to Nicks that she felt she was being

discriminated against due to her disability, i.e., her health issues. [R. 24 at 19.] As stated in

Ezell's Response, disability discrimination is a practice made unlawful by KRS 344.040(1)(a).

[R. 24 at 19; Ky. Rev. Stat. Ann. § 344.040(1)(a).] Thus, the Court finds that Ezell successfully

alleged that she complained about a discriminatory practice when she stated in her deposition: "I

also told her that I felt I was being discriminated against because I had been having health

issues." [R. 24-1 at 37.] Furthermore, the Sixth Circuit has stated: "A person opposing an

apparently discriminatory practice does not bear the entire risk that it is in fact lawful; he or she

must only have a good faith belief that the practice is unlawful." *Booker v. Brown & Williamson

Tobacco Co.*, 879 F.2d 1304, 1312–13 (6th Cir. 1989); *see also Lindsey v. Bd. of Trustees of

Univ. of Kentucky*, No. 2016-CA-000521-MR, 2018 WL 663090, at *9 (Ky. Ct. App. Feb. 2,

2018) ("[U]nder the federal rule, all that is required to obtain retaliation protection under KRS

344.280(1) is that the employee have a reasonable and good faith belief that the adverse

employment practices she opposed were KCRA violations."). At this point in the analysis, Ezell

only needed a good faith belief that her suspension was unlawful. The Court finds that she did, and that she alleged such in her deposition.

Under the second element, causal connection, both parties incorporate the same arguments previously analyzed by the Court. Thus, as previously explained, the Court finds that the temporal proximity between the events in this case is close enough to establish a causal connection between the protected activity and the adverse employment action.

Finally, Renal Care argues that Ezell has not established that its legitimate reason for termination was merely pretext, incorporating by reference the arguments used in its discussion of FMLA retaliation. [R. 20-1 at 25.] The Court previously explained that Renal Care's purported legitimate reason is intimately intertwined with Ezell's FMLA leave, and therefore, we reject Renal Care's contention. Thus, Renal Care's Motion for Summary Judgment as it pertains to Ezell's claim of KCRA retaliation is DENIED.

### B. KCRA Disability Discrimination

"The language of the KCRA, Ky. Rev. Stat. § 344.010 et seq., mirrors that of the ADA; consequently, claims brought under the KCRA are interpreted consistently with the standards developed under the ADA." *Bryson v. Regis Corp.*, 498 F.3d 561, 574 (6th Cir. 2007). The KCRA makes it unlawful for an employer to discriminate against an otherwise qualified individual on the basis of a disability. Ky. Rev. Stat. § 344.040(1)(a); *accord* 42 U.S.C. § 12112(a). A disability discrimination claim may be asserted under various legal theories, and established through either direct or indirect evidence, *see Noel v. Elk Brand Mfg. Co.*, 53 S.W.3d 95, 100–01 (Ky. Ct. App. 2000); *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868–69 (6th Cir. 2007).

When a plaintiff brings a claim using direct evidence, the Court uses the following framework:

> (1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Kleiber*, 485 F.3d at 869. When a plaintiff uses indirect evidence, the plaintiff must establish a prima facie case of disability under the American with Disabilities Act (ADA), which requires the plaintiff to show that:

> 1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011). After the plaintiff has established a prima facie case, the parties must engage in the *McDonnell Douglas* burden shifting framework. *Id*.

Renal Care provides three arguments as to why Ezell's claim of KCRA disability discrimination should fail: (1) Ezell has not established that she had a disability during her employment under the KCRA, (2) Ezell has not provided direct evidence of discrimination, and (3) Ezell has not established pretext. As an initial matter, the Court notes that Ezell alleges different types of health issues in her Complaint and in her Response. In her Complaint, Ezell plead that she suffers from the following disabilities: autoimmune diseases, including rheumatoid arthritis and Hashimoto's thyroid, and increased risk of lymphoma. [R. 1-1 at 8.] However, she

described experiencing abdominal pain in other sections of her Complaint. [*See, e.g.,* R. 1-1 at 5, ¶ 21.] In her Response, Ezell claims that she is disabled due to abdominal pain, [R. 24 at 9], as well as severe constipation, thrush, appendicolith, vomiting blood, fever, loss of appetite, and muscle fatigue, [R. 24 at 12-13.] The Court acknowledges Renal Care's argument that Ezell may have abandoned the disability discrimination claim in her Complaint by expanding her claim to assert new theories for the first time in her Response. [R. 28 at 1-2.] However, the Court does not find it necessary to rule on this matter at this time as it finds that Ezell's disability discrimination claim fails for other reasons.

First, Renal Care argues that the Court should use the KCRA's statutory definition of "disability" rather than the expanded version of the ADA Amendments Act of 2008 (ADAAA). [R. 28 at 2.] Furthermore, Renal Care asserts that Ezell failed to provide any evidence showing that her condition, involving the several health issues that allegedly occurred during the last two months of her employment, is a disability as defined under the KCRA. [*Id.* at 3.] Ezell responds that the matter should be decided using the ADAAA definition, as more recent cases from the Western District of Kentucky have adhered to it. [R. 24 at 11.] Furthermore, she argues that her health issues should be considered a disability because they qualify as impairments under the ADAAA. [*Id.* at 12.] As no published Kentucky case has addressed how the ADAAA affects, if at all, claims for disability discrimination brought under the KCRA, the Court will continue to interpret the KCRA consistent with pre-ADAAA jurisprudence. *See Laferty v. United Parcel Service, Inc.*, 186 F. Supp. 3d 702, 707 n.3 (W.D. Ky. 2016) (collecting cases); *see also Krueger v. Home Depot USA, Inc.,* 674 F. App'x 490, 494–95 (6th Cir. 2017) ("[T]he Kentucky legislature adopted the language in the KCRA in 1992 and intended it to reflect the language of the ADA at that time, not the subsequent amendments. Thus, the KCRA retains the ADA's

former definition of disability."); *Sanders v. Bemis Co., Inc.*, No. 3:16-CV-00014-GFVT, 2017 WL 3401277, at *5 n.3 (E.D. Ky. Aug. 8, 2017) ("The Sixth Circuit and a number of federal district courts continue to apply pre-ADAAA jurisprudence to their KCRA analyses, and '[u]ntil such time as the Kentucky Supreme Court or General Assembly speaks on this issue, the Court will take that approach.'").

To satisfy the definition of "disability" under the KCRA, Ezell must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show how the impairment substantially limits one or more of those activities. *See Howard Baer, Inc. v. Schave,* 127 S.W.3d 589, 592 (Ky. 2003); *Laferty*, 186 F. Supp. 3d at 708-09.

In regards to the first prong, "the EEOC regulations define a physical or mental impairment as "[a]ny physiological disorder or condition . . . affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine . . .." *Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F. Supp. 2d 653, 658 (W.D. Ky. 2012) (citing 29 C.F.R. § 1630.2(h)(1)). Ezell only provided medical documentation of the abdominal pain, constipation, [R. 24-7 at 15], and appendicolith, [*Id*. at 21.] In her Response, Ezell asserts that her conditions of severe constipation, thrush, appendicolith, vomiting blood, and fever all qualify as impairments because they affect her digestive and immune systems. [R. 24 at 12.]

Under the second prong, Ezell must identify one or more appropriate major life activities. "Examples of 'major life activities,' for purposes of defining 'disability' under Americans with Disabilities Act (ADA) and Kentucky Civil Rights Act (KCRA), include, among other things, walking, seeing, hearing, performing manual tasks, caring for oneself, speaking, breathing,

learning, and working." *Brown v. Humana Ins. Co.*, 942 F. Supp. 2d 723, 731 (W.D. Ky. 2013) (quoting *Howard Baer*, 127 S.W. 3d at 592). Ezell identifies the major life activity of "caring for herself." [R. 24 at 13.] She also implies that another major life activity at stake is the ability to control one's bowels. [*Id*.]

Finally, under the third prong, Ezell is required to show how her impairments substantially limit one or more of those major life activities. "The term 'substantially limits' is to 'be construed broadly in favor of expansive coverage' and applies where an impairment 'substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.'" *Brown*, 942 F. Supp. 2d at 731 (quoting 29 C.F.R. § 1630.2(j)(1)). Ezell provides no explanation, argument, or evidence as to how any of the impairments she listed in either her Response or her Complaint substantially limited a major life activity. She states that gastrointestinal ailments like Crohn's disease and irritable bowel syndrome have been determined to be disabilities under the ADA, but fails to explain how that is relevant to her constipation and abdominal pain. [R. 24 at 13.] More importantly, she fails to explain how her impairments substantially limit her ability to perform a major life activity as compared to most people in the general population.

As support, Ezell cites two cases from within this circuit: *Workman v. Frito-Lay, Inc.* and *Brown v. Humana Ins. Co.*. Both of these cases involved plaintiffs suffering from irritable bowel syndrome whose frequent use of the restroom interfered with their ability to work. *See Workman*, 165 F.3d 460, 463-64 (6th Cir. 1999); *Brown*, 942 F. Supp. 2d at 729-30. In *Brown*, the plaintiff had to use the restroom twenty times in one day. *Brown*, 942 F. Supp. 2d at 731. In *Workman*, the plaintiff reduced the number of restroom visits from ten to fourteen times a day to one to four times a day, but she never knew when that would occur, forcing her to leave the assembly line at

work. *Workman*, 165 F.3d at 463-64. Here, Ezell was never diagnosed with irritable bowel syndrome, nor did she require multiple bathroom visits throughout the work day. Without any further explanation or evidence from Ezell, the Court finds that she has failed to establish the third prong required for fulfilling the definition of a "disability" under the KCRA. Thus, Ezell has failed to establish the first element of a disability discrimination claim through direct or indirect evidence. As Ezell failed to establish a prima facie case of disability discrimination, it is unnecessary for the Court to engage in the *McDonnell Douglas* burden shifting framework.

In sum, Renal Care's Motion for Summary Judgment as it pertains to Ezell's claim of disability discrimination is GRANTED.

## CONCLUSION

For the foregoing reasons, Renal Care's Motion for Summary Judgment, [R. 20], is **GRANTED IN PART AND DENIED IN PART**.

As it pertains to Ezell's claim of FMLA interference, Renal Care's Motion for Summary Judgment, [R. 20], is DENIED.

As it pertains to Ezell's claim of FMLA retaliation, Renal Care's Motion for Summary Judgment, [R. 20], is DENIED.

As it pertains to Ezell's claim of KCRA retaliation, Renal Care's Motion for Summary Judgment, [R. 20], is DENIED.

As it pertains to Ezell's claim of disability discrimination, Renal Care's Motion for Summary Judgment, [R. 20], is GRANTED.

**IT IS SO ORDERED**.

*Thomas B. Russell*

**Thomas B. Russell, Senior Judge**
**United States District Court**

May 1, 2018

cc: Counsel of Record

26